<u>**UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE DISTRICT OF NEW JERSEY**</u>

_____
                                        :
JOSEPH R. PLUM,                         :
                                        :
                    Plaintiff,          :
                                        :          Civil Action No. 05-2802 (JAG)
        v.                              :
                                        :                **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY ADMINISTRATION,                :
                                        :
                    Defendant.          :
_____:


<u>**GREENAWAY, JR., U.S.D.J.**</u>


<u>**INTRODUCTION**</u>

Plaintiff Joseph R. Plum seeks review of the Commissioner of Social Security's

("the Commissioner") decision denying his application for Supplemental Social Security

Benefits and Disability Insurance Benefits, pursuant to 42 U.S.C. § 405(g).[1]  Plaintiff

argues that the decision is not supported by substantial evidence and should therefore be

reversed or, in the alternative, remanded to the Commissioner for reconsideration.  For

the reasons set forth in this opinion, this Court finds that the Commissioner's decision is

supported by substantial evidence and should be affirmed.

_____

[1] This section of the Social Security Act (hereinafter "the Act") provides that any
individual may obtain a review of any final decision of the Commissioner made
subsequent to a hearing to which he or she was a party.  The federal district court for the
district in which the plaintiff resides is the appropriate place to bring such action.  42
U.S.C. § 405(g).

## PROCEDURAL HISTORY

On February 28, 2000, Plaintiff filed an application for Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB").  (Tr. 14.)  Plaintiff's claim was based upon alleged disability due to a pituitary macroadenoma[2] (a prolactin[3] secreting tumor), hypogonadism[4], possible visual field decrease, low testosterone, bone density loss, osteoporosis[5], extreme fatigue, depression, sweating, vomiting, loss of memory and concentration, pain in the back and both arms, nausea, and lightheadedness.  (Tr. 15.)[6]  Plaintiff filed a request for reconsideration which was denied.  (Tr. 14.)  Following Plaintiff's request for a hearing, Plaintiff appeared before Administrative Law Judge Dennis O'Leary ("ALJ") on September 17, 2003, in the Newark, New Jersey Office of Hearings and Appeals.  (Tr. 26.)  ALJ O'Leary issued his decision on March 5, 2004, finding that the Plaintiff was not eligible for Supplemental Security Income Benefits or Disability Insurance Benefits based upon disability.  (Tr. 24.)  The following is a summary of his findings:

---

[2] "A tumor of glandular epithelium in which the cells of the tumor are arranged in a recognizable glandular structure.  An adenoma may cause excess secretion by the affected gland, such as acidophilic pituitary adenoma resulting in an excess of growth hormone."  Mosby's Medical, Nursing, & Allied Health Dictionary 37 (5th ed. 1998) [hereinafter "Mosby's"].

[3] "A hormone produced and secreted into the bloodstream by the anterior pituitary gland. Prolactin, acting with estrogen, progesterone, thyroxine, insulin, growth hormone, glucocorticoids, and human placental lactogen, stimulates the development and growth of the mammary glands…Prolactin is similar to growth hormone in its chemical structure. Prolactin excess is seen in the presence of prolactin-secreting pituitary tumors in both sexes."  Mosby's at 1330.

[4] "A deficiency in the secretory activity of the ovary or testis.  The condition may be primary or caused by a gonadal dysfunction involving the Leydig's cells in the male, or it may occur secondary to a hypothalamus-primary disorder."  Mosby's at 800.

[5] "A disorder characterized by abnormal loss of bone density."  Mosby's at 1169.

[6] "The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision."  42 U.S.C. § 405(g).  "Tr" refers to said transcript.

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Act and is insured for benefits through December 31, 2002, but not thereafter.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's pituitary adenoma and medication side effects associated with treatment thereof is a "severe" impairment, based upon the requirements in the Regulations (20 C.F.R. §§ 404.1520 and 416.920).

4.  The medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: sedentary work not involving working at unprotected heights or in proximity to hazardous machinery.

7.  The claimant's past relevant work as a radio announcer and a customer service representative did not require the performance of work-related activities precluded by his residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

8.  The claimant's medically determinable severe impairment does not prevent him from performing his past relevant work.

9.  The claimant has not been under a "disability" as defined in the Act and Regulations, at any time through the date of the decision (20 C.F.R. §§ 404.1520(e) and 416.920(e)).

(Tr. 23, 24.)

## STATEMENT OF THE FACTS

**A.    Background**

Plaintiff, Joseph R. Plum, was born on July 24, 1960, and was age 37 at the onset of his alleged disability.  (Tr. 15.)  He has a high school degree and was employed as a radio announcer/production engineer and a service manager for a warehouse prior to the onset of his alleged disability.  (Id.)  Plaintiff testified that he suffered from a pituitary

macroadenoma, and that he was taking Bromocriptine medication twice a day to treat his condition.  (Tr. 31.)  Plaintiff testified that he suffered from low testosterone, extreme fatigue, back pain, and visual problems as a result of his disease and medication.  (Tr. 31-34.)

**B.**     **Medical Evidence**

The record indicates that Plaintiff has been evaluated by numerous physicians on several occasions.

1.     Examination by Dr. Shalani Mali

Dr. Shalani Mali examined Plaintiff at the Mountainside Hospital Outpatient Clinic on January 20, 2000.  (Tr. 78.)  Dr. Mali reported that Plaintiff's chief complaint was sexual dysfunction, and that Plaintiff had tested as testosterone deficient when living in North Carolina.  (Id.)  Dr. Mali also noted that Plaintiff denied having any headaches or loss of vision, and that he admitted to suffering from depression and suicidal ideation. (Id.)

Dr. Mali examined Plaintiff at the Mountainside Hospital Outpatient Clinic on December 18, 2000.  (Tr. 63.)  Dr. Mali noted that Plaintiff's pituitary macroadenoma had been diagnosed after his visit in January, that Plaintiff was started on Bromocriptine treatment, and that his prolactin levels had begun to decrease.  (Id.)  Dr. Mali reported that Plaintiff was sexually active, had morning erections, and was not depressed.  (Id.) She noted that Plaintiff claimed to suffer from pain in his coccyx[7] when sitting for a long time.  (Id.)  Dr. Mali also reported that Plaintiff had suffered from some medication side

---

[7] "The beaklike bone joined to the sacrum by a disk of fibrocartilage at the base of the vertebral column."  Mosby's at 359.

effects like nausea and lightheadedness, but that he had no history of falls; she also noted

that he would be sent to the Endocrinology Clinic for medication adjustment.  (Tr. 65.)

Dr. Mali also examined Plaintiff at the Mountainside Hospital Outpatient Clinic

on January 9, 2002.  (Tr. 71.)  Dr. Mali's report, dated January 9, 2002, indicated that

Plaintiff had been diagnosed with pituitary macroadenoma in February 2000, and an MRI

done on December 4, 2001 showed a retraction of the pituitary macroadenoma.  (Id.)

The report also noted that the Plaintiff experienced side effects from his Bromocriptine

prescription, including lightheadedness, decreased appetite, and nausea.  (Id.)  Dr. Mali

reported that Plaintiff had lost thirty pounds in the two preceding years, and noted that he

had lower back pain over the sacroiliac joint.[8]  (Tr. 71, 75.)

### 2.        Examination by Dr. Maris Davis

Dr. Maris Davis is an endocrinologist who examined Plaintiff at Mountainside

Outpatient Clinic on January 15, 2002 in a follow up visit for his pituitary

macroadenoma.  (Tr. 101.)  Dr. Davis reported that Plaintiff had been taking

Bromocriptine for treatment and that his prolactin levels had greatly improved and were

within normal range.  (Id.)  Dr. Davis also noted that Plaintiff experienced side effects

from the use of Bromocriptine, including nausea, extreme fatigue, and hot flashes which

she attributed to hypergonadism related to Plaintiff's pituitary macroadenoma.  (Id.)  Dr.

Davis also reported that Plaintiff had low bone density and lower back pain associated

with his macroadenoma.  (Id.)

---

[8] "An irregular synovial joint between the sacrum and the ilium on either side."  Mosby's
at 1443.

      3.    <u>Examination by Dr. Sabahat Bokhari</u>

Plaintiff was examined by Dr. Sabahat Bokhari on October 29, 2003.  (Tr. 203.)
Dr. Bokhari reported that Bromocriptine treatment had reduced the symptoms caused by
his pituitary macroadenoma, but that Plaintiff experienced side effects from the
treatment, including vomiting, extreme fatigue, headaches, and dizziness.  (<u>Id.</u>)  Dr.
Bokhari noted that Plaintiff experienced decreased peripheral vision in his lower right
quadrant.  (Tr. 204.)

      4.    <u>Examination by William P. Babik, M.S.</u>

William P. Babik, a licensed psychologist, performed a psychological/vocational
assessment of Plaintiff on January 20, 2004.  (Tr. 221.)  Babik reported that Plaintiff
stated that he was depressed and had suicidal ideation.  (Tr. 223.)  He concluded that
Plaintiff was disabled and that he was unable to perform work at the sedentary level of
exertion.  (Tr. 226-27.)

      5.    <u>Examination by Dr. Martin Fechner</u>

Dr. Martin Fechner reviewed the evidence on record and completed a series of
interrogatories on January 7, 2004, upon the request of ALJ O'Leary.  (Tr. 210.)  Dr.
Fechner reported that Plaintiff had normal prolactin levels, indicating that the tumor size
had decreased following his Bromocriptine treatment.  (Tr. 211.)  Dr. Fechner also
reported that if Plaintiff's onset date was March 31, 1999, he would recommend a closed
period of less than sedentary functioning until December 18, 2000 due to non-diagnosis
and lack of treatment for the pituitary macroadenoma.  (Tr. 210.)  Finally, Dr. Fechner
reported that, for the period of December 18, 2000 to the present, Plaintiff was capable of

performing a full range of sedentary activity, even taking into account residual fatigue and nausea from the Bromocriptine treatment.  (Tr. 211.)

      6.     <u>Examination by Dr. Joseph A. DeCorso, Jr.</u>

Dr. Joseph A. DeCorso, Jr. examined Plaintiff on August 14, 2003.  (Tr. 188.) Dr. DeCorso reported that he reviewed Plaintiff's medical history, and that the MRI reports contained within clearly showed that a pituitary adenoma was present.  (Tr. 189.) Dr. DeCorso opined that the Plaintiff was disabled and should qualify for SSI and DIB benefits.  (<u>Id.</u>)

      7.     <u>Examination by Dr. Sidney E. Friedman</u>

Dr. Sidney E. Friedman examined Plaintiff on August 17, 2002 at the request of Plaintiff's counsel.  (Tr. 136.)  Dr. Friedman reported that Plaintiff's Bromocriptine treatment was effective in causing the tumor to shrink, but also caused overwhelming and disabling side effects.  (Tr. 138.)  Dr. Friedman noted that Plaintiff was precluded from pursuing alternative therapy due to his inability to afford more effective treatment.  (Tr. 139.)  Dr. Friedman stated that Plaintiff continued to receive medical treatment at the free clinic at Mountainside Hospital, where Dr. Mali was his primary physician.  (<u>Id.</u>)  Dr. Friedman opined that Plaintiff was totally disabled and was unable to return to any prior gainful occupation; he stated that Plaintiff's mental status evaluation was appropriate, but that Plaintiff did not have the energy or strength to engage in successful employment. (Tr. 142.)  Dr. Friedman stated that it was his opinion that Plaintiff had been unable to work since approximately 1993.  (<u>Id.</u>)

8.      Examination by Dr. Khoshnu

Dr. Khoshnu examined Plaintiff on October 24, 2003 upon the request of ALJ O'
Leary.  (Tr. 206.)  Dr. Khoshnu reported that Plaintiff claimed to be suffering from
depression, mood swings, lack of sleep, and hot flashes as a result of his illness.  (Tr.
207.)  Dr. Khoshnu also stated that Plaintiff did not report having suicidal or homicidal
ideation or any auditory or visual hallucinations.  (Tr. 208.)

## DISCUSSION

### A.      Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42
U.S.C. § 405(g).  The Court must affirm the Commissioner's decision if it is "supported
by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health
and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28
(3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389,
401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).
Substantial evidence "is more than a mere scintilla of evidence but may be less than a
preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard,
841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then
determine whether there is substantial evidence to support the Commissioner's decision.
See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing
court is not "empowered to weigh the evidence or substitute its conclusions for those of
the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied

sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F. 2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion. Blalock, 483 F. 2d at 775.

**B.     Statutory Standards**

The claimant bears the initial burden of proving his or her disability. 42 U.S.C. § 423(d)(5). To qualify for SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled." 42 U.S.C. § 1381. A claimant is deemed "disabled" under the Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D.Del. 2002). Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.      The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[9]  20 C.F.R. § 404.1520(b).  If a claimant is to be found engaged in such activity, the claimant is not "disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment with the impairments presumed to be severe enough to preclude any gainful

---

[9] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 (2003)

work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. §

404.1594(f)(2).  If the claimant's impairment meets or equals one of the listed

impairments, he will be found disabled under the Social Security Act.  If the claimant

does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps

four and five.  In Burnett v. Comm'r, 220 F.3d 112 at 119-20,120 n.2 (3d Cir. 2000), the

Third Circuit found that to deny a claim at step three, the ALJ must specify which listings

apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart,

364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that an ALJ is not

required "to use particular language or adhere to a particular format in conducting his

analysis," but must merely ensure "that there be sufficient explanation to provide

meaningful review of the step-three determination."  An ALJ satisfies this standard by

"clearly evaluating the available evidence in the record and then setting forth that

evaluation in an opinion, even where the ALJ did not identify or analyze the most

relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 Fed. Appx. 468, 471 (3d Cir.

2005).

Step four requires the ALJ to consider whether the claimant retains the residual

functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the

claimant is able to perform his past relevant work, he will be found to be not disabled

under the Act.  If the claimant is unable to resume his past work, and his condition is

deemed "severe" yet not listed, the evaluation moves to the final step.  At the fifth step,

the burden of production shifts to the Commissioner, who must demonstrate that there

are other jobs existing in the national economy which the claimant can perform,

consistent with his medical impairments, age, education, past work experience, and

residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant

number of jobs that claimant can perform, claimant will be found not disabled.  Id.

**D.**     **ALJ O'Leary's Findings**

ALJ O'Leary applied the five-step sequential evaluation and determined that

claimant is not disabled.  At the first step of his analysis, ALJ O'Leary noted that since

the onset date of Plaintiff's alleged disability, he had not engaged in any substantial

gainful activity.  (Tr. 16.)  At the second step, ALJ O'Leary concluded that the Plaintiff

had a pituitary adenoma and medication side effects associated with treatment thereof,

which imposes "more than minimal" restrictions on his ability to perform a full range of

basic physical work-related activities, and therefore constitutes a severe medical

impairment.  (Tr. 20.)  At the third step, ALJ O'Leary noted that, although Plaintiff's

illness constitutes a severe medical impairment, Plaintiff's illness does not meet or

medically equal the criteria of any of the disorders listed in Appendix I, Subpart P,

Regulations No. 4.  (Id.)  See also 20 C.F.R. § 404.1520(c).

As required by the fourth step of the inquiry, ALJ O'Leary determined the extent

of Plaintiff's residual functional capacity and whether it allows the performance of his

past relevant work.  (Tr. 21.)  In his analysis of Plaintiff's residual functional capacity,

ALJ O'Leary noted that the regulations require that the ALJ consider all symptoms,

including pain, and the extent to which these symptoms can reasonably be accepted as

consistent with the objective medical evidence and other medical evidence based on the

requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Ruling 96-7p.

(Id.)  ALJ O'Leary concluded that the Plaintiff's descriptions of his physical functional

limitations were not consistent with the entirety of the medical evidence.  (Tr. 22.)  The

ALJ further concluded that "the objective medical documentation fails to substantiate the degree of functional compromise asserted."  (Id.)

In determining Plaintiff's residual functional capacity, the ALJ made several observations as to Plaintiff's credibility and the consistency of his testimony with the medical evidence.  First, he noted that there was no evidence provided of any psychological or psychiatric treatment attended by the Plaintiff.  (Tr. 20.)  The ALJ further observed that all of the mental status evaluations in the record state that Plaintiff was alert and fully oriented, and that there was no indication of any psychotic tendencies such as hallucinations or delusions.  (Id.)  He noted that Dr. DeCorso and Dr. Babik described Plaintiff as being intelligent; Dr. Friedman described Plaintiff as resourceful, cognitively intact, and very well spoken; and that Dr. Khoshnu, while assessing significant mental functional restrictions, based his findings upon Plaintiff's subjective reporting.  (Id.)  ALJ O'Leary noted that he did not give much weight to Dr. Khoshnu's report because "it is noted that the results of [t]his examination were essentially benign, with no significant abnormalities in thought process or content appreciated."  (Id.)  The ALJ concluded his evaluation of Plaintiff's residual mental functional capacity by stating that Plaintiff suffered from a depressive disorder "which [has] resulted in no more than slight limitations in his ability to conduct his activities of daily living, sustain social functioning, and maintain concentration, persistence, and pace."  (Id.)  ALJ O'Leary ultimately found that this impairment was not severe.  (Id.)

ALJ O'Leary also noted that the evidence "unequivocally documents the presence of a pituitary macroadenoma, an undoubtedly life-threatening and life-altering clinical manifestation."  (Tr. 21.)  However, he also noted that there was medical evidence on the

13

record showing significant treatment response, including progressive and continual decrease of the tumor size since February, 2000.  (Id.)  The ALJ relied on the testimony of Dr. Mali, who stated that the chief complaint of Plaintiff during his January 2000 visit was sexual dysfunction; ALJ O'Leary noted that "an individual purporting to be totally unable to engage in any work activities would voice chief complaints referable to pain or immobility, as opposed to sexual function."  (Id.)

ALJ O'Leary also noted that all of the physical examinations show that Plaintiff was able to walk normally, that he suffered from no neurological deficits, that he had full motor strength in all extremities, and that he had a full range of motion in all body joints. (Id.)  The ALJ noted that the Plaintiff experienced side effects associated with his Bromocriptine therapy, including nausea, vomiting, and lightheadedness.  (Id.)  However, ALJ O'Leary stated that "there is no substantiation for a finding that such side effects are totally preclusive of all work activity."  (Id.)  In making such a determination, the ALJ relied on evidence from several medical reports in which Plaintiff claimed that "he was tolerating the medication well with no vomiting" (3/6/00); that "he reported feeling good, not being depressed, and experiencing some nausea and lightheadedness" (12/18/00); and that "he reported nausea, vomiting and lightheadedness, but was experiencing less headaches than during the previous year (1/9/02)."  (Tr. 21-22.)  ALJ O'Leary concluded that the Plaintiff "at all times material herein, has retained the residual functional capacity to perform at least sedentary work."  (Tr. 22.)  ALJ O'Leary did not perform any step five analysis as it was not necessary in formulating his opinion.

**E.**    <u>**Analysis**</u>

The argument section of Plaintiff's brief lists just one argument: the decision of the ALJ is not supported by substantial evidence.  Plaintiff then gives roughly thirteen pages of case descriptions on various points, with occasional commentary applying them to the instant matter, generally asserting that the ALJ's decision is incompatible with the particular case.  At no point does Plaintiff develop the argument that the decision of the ALJ is not supported by substantial evidence.  It is only in the final two pages that Plaintiff turns from listing cases to discussion; even then, however, he never develops the argument that the decision of the ALJ is not supported by substantial evidence.  Despite Plaintiff's failure to explain his argument, this Court will review the decision of the Commissioner to determine whether it is supported by substantial evidence.  In addition, this Court will examine Plaintiff's assertions of particular errors by the ALJ.

Plaintiff contends that ALJ O'Leary's decision should be reversed or, alternatively, it should be remanded to the Commissioner for reconsideration, because it was not supported by substantial evidence.  Plaintiff argues that: 1) ALJ O'Leary erred by failing to permit Dr. DeCorso to testify at the supplemental hearing; 2) ALJ O'Leary erred by failing to recognize that the side effects of Plaintiff's Bromocriptine treatment are themselves disabling; 3) ALJ O'Leary erred by failing to obtain a vocational expert's testimony regarding Plaintiff's non-exertional impairments, namely fatigue; and 4) ALJ O'Leary erred by improperly discounting the weight to be given to the opinions of Plaintiff's treating physicians.  (Pl.'s Br. 20-35).

1. **ALJ O'Leary Erred by Failing to Permit Dr. DeCorso to Testify at the Supplemental Hearing.**

Plaintiff contends that ALJ O'Leary's decision not to permit Dr. DeCorso to testify at the supplemental hearing should be reversed and is grounds for a new hearing, under the holding set forth in Claussen v. Charter, 950 F. Supp. 1287 (D.N.J. 1996).  The Plaintiff cites this case for the proposition that "where an Administrative Law Judge finds a physician's report as to a disability claimant conclusory or unclear, it is incumbent upon the Administrative Law Judge to secure additional evidence from another physician."  (Pl.'s Br. at 29, quoting Claussen, 950 F. Supp. at 1295).  The holding in Claussen is not applicable to the facts of the instant matter.

In Claussen, the court held that the ALJ erred by not securing additional medical testimony upon finding that the report from the claimant's primary physician was conclusory or unclear.  Id. at 1296.  Plaintiff erroneously relies on this holding, which finds that it is the responsibility of the ALJ to secure additional medical testimony in cases in which a physician's report is found to be conclusory or unclear.  That is not the case here.

In the instant matter, ALJ O'Leary's failure to permit Dr. DeCorso to testify is not contrary to the holding in Claussen; there was no uncertainty as to Dr. DeCorso's report and the decision of ALJ O'Leary was supported by contrary, substantial medical evidence in the record.  ALJ O'Leary's decision referred frequently to the medical opinions entered into evidence regarding the Plaintiff's statements to his physicians evidencing his condition.  In addition, there are a substantial number of medical reports in the record of this case which fully provided ALJ O'Leary with information regarding

the nature and severity of Plaintiff's impairments, unlike the single medical report that the ALJ in <u>Claussen</u> chose to dismiss as conclusory.

Another distinguishing factor between <u>Claussen</u> and this case is the medical evidence which was entered into the record.  The ALJ in <u>Claussen</u> failed to secure any additional medical testimony other than the one medical report which was improperly dismissed as conclusory; in this case, ALJ O'Leary secured the medical opinions of numerous state physicians and based his decision on numerous other medical reports contained within the record.

Additionally, Plaintiff argues that under the holding set forth in <u>Burnett</u>, 220 F.3d 112 (3d Cir. 2000), ALJ O'Leary was required to permit Dr. DeCorso to testify at the supplemental hearing.  (Pl.'s Br. at 32).  <u>Burnett</u> held that an ALJ erroneously rejected a claimant's testimony regarding the extent of her knee and back pain on grounds that it was not supported by objective medical evidence; the ALJ failed to consider the supporting testimony of the claimant's husband and neighbor.  <u>Burnett</u>, 220 F.3d at 122. Plaintiff erroneously relies on this case.  This aspect of <u>Burnett</u> applies to situations in which the ALJ refuses to credit testimony offered at the hearing, not in situations in which the right to offer testimony as post-hearing evidence is at issue.  As the Commissioner correctly argues, as to the post-hearing proffering of evidence, the relevant procedural guidelines clearly state that:

> If the claimant requests an opportunity to question the author(s) of any posthearing report *other than the written response of a medical expert or vocational expert to interrogatories*, *the ALJ must determine if questioning of the author is required to inquire fully into the matters at issue* and, if so, whether the questioning should be conducted through live testimony or written interrogatories.

HALLEX I-2-730[10] (emphasis added).

Therefore, under these procedural guidelines, ALJ O'Leary had the discretion to determine whether the testimony of Dr. DeCorso was necessary to "inquire fully into the matters at issue." Id. The ALJ based his determination that Dr. DeCorso did not need to testify on the fact that "he has not cited a single medical finding in either of his reports, nor has he specified any manner of treatment provided. Hence, the above opinions cannot be accorded significant probative weight, inasmuch as they are inconsistent with the weight of the objective medical documentation." (Tr. 22-23.)

ALJ O'Leary correctly exercised his discretion in refusing to allow Dr. DeCorso to testify, since the substantial medical evidence in the record was fully developed and Plaintiff provided little or no evidence that Dr. DeCorso could have provided information to illuminate the determinative medical issues in the case more completely.

**2. ALJ O'Leary Erred by Failing to Recognize That the Side Effects of Plaintiff's Bromocriptine Treatment Are Themselves Disabling**

Plaintiff argues that ALJ O'Leary erred by failing to consider seriously the disabling side effects of Plaintiff's Bromocriptine treatment. Plaintiff contends that ALJ O'Leary failed to explain his belief that Plaintiff's claims of fatigue, nausea, and vomiting (as side effects of his Bromocriptine treatment) were less than credible. This argument is without merit, as the following excerpt from the transcript shows that ALJ O'Leary explicitly explained his determination concerning this issue:

> It is not doubted that the claimant experiences some degree of adverse side effects associated with his Bromocriptine therapy. These would include nausea, vomiting, and lightheadedness. However, there is no substantiation for a finding that such side effects are totally preclusive of all work activity. There is also evidence that such effects are not constant as alleged. For instance, it is noted that initially, the claimant reported that he was tolerating the medication well with

_____

[10] HALLEX I-2-730, http://www.ssa.gov/OP_Home/hallex/I-02/I-2-7-30.html.

> no vomiting (3/6/00). He reported feeling good, not being depressed, and experiencing some nausea and lightheadedness (12/18/00). He reported nausea, vomiting and lightheadedness, but was experiencing less headaches than during the previous year (1/9/02).

(Tr. 21-22.)

This quote is from the ALJ's decision. It clearly shows that the ALJ based his determination of the credibility of Plaintiff's claims on the contradictory nature of the severity of side effects alleged in Plaintiff's own statements to physicians regarding the non-serious and non-constant nature of these side effects.

Additionally, Plaintiff cites Erwin v. Secretary of H.E.W., 312 F. Supp. 179 (D.N.J. 1970), stating that it holds that where treatment to remove a medical disability has the result of substantially removing one problem but causing another, it is not reasonable to say that clearing up the original condition terminates eligibility for disability. (Pl.'s Br. at 28-29, quoting Erwin, 312 F. Supp. at 184). This argument mischaracterizes the ALJ's decision, as ALJ O'Leary did not base his decision on the successful treatment of Plaintiff's original condition. Moreover, this argument fails because of the ALJ's finding that the serious side effects alleged by Plaintiff were not credible, considering the weight of the objective medical evidence on record.

As discussed above, this determination by the ALJ is supported by substantial evidence from the medical reports on record, correctly referred to by the ALJ in his decision, and therefore should be affirmed by this court. Accordingly, this argument made by Plaintiff is without merit since it is clearly contradicted by the explanation provided by the ALJ in his decision and the medical evidence in the record.

**3.  ALJ O'Leary Erred by Failing to Obtain a Vocational Expert's Testimony Regarding Plaintiff's Non-Exertional Impairments, Including Severe Fatigue.**

Plaintiff argues that ALJ O'Leary erred by failing to obtain testimony from a vocational expert regarding Plaintiff's non-exertional limitations, including severe fatigue from his Bromocriptine treatment.  In cases where both exertional and non-exertional impairments are present, the Commissioner cannot meet the burden of proof for a determination of whether the claimant can perform any work in the national economy by relying exclusively on the medical vocational guidelines ("grids"); taking a vocational expert's testimony is required in such cases.  Sykes v. Apfel, 228 F.3d 259, 270 (3d Cir. 2000).  Sykes is not applicable to this case because it addressed the analysis at step five.  ALJ O'Leary's analysis did not proceed past step four, since he correctly determined that Plaintiff retained the residual functional capacity to perform his previous work.  Therefore, Plaintiff's argument is without merit.

**4.  ALJ O'Leary Erred by Improperly Discounting the Weight Accorded to the Medical Opinions of Plaintiff's Treating Physicians.**

Plaintiff's final argument is that ALJ O'Leary erred by improperly discounting the weight to be given to the opinions of Plaintiff's treating physicians.  Plaintiff argues that his treating physicians, without exception, all indicated that he was disabled.  (Pl.'s Br. 27).  This argument is without merit for several reasons.  ALJ O'Leary noted in his decision "that the physician with the most significant longitudinal treatment history with Plaintiff, Dr. Mali, has never opined that the claimant is totally, or even partially disabled."  (Tr. 22.)  Additionally, Dr. Friedman, Dr. Davis, Dr. Babik, and Dr. DeCorso cannot realistically be considered to be treating physicians; in fact, the first two only examined Plaintiff once.  Dr. Babik never physically examined the Plaintiff, but based

his opinion on the reports of Dr. Davis and Dr. Friedman.  Finally, Dr. DeCorso only

began to see Plaintiff several months before the hearing, and the ALJ chose to give his

report less weight in accordance with the fact that no substantive medical findings

relevant to Plaintiff's disability were included in his medical reports.  Therefore, this

argument by Plaintiff is without merit.

<u>**CONCLUSION**</u>

This Court has reviewed the ALJ's decision and the evidentiary record and

determined that the ALJ's decision is supported by substantial evidence.  For the reasons

stated above, the Commissioner's determination is AFFIRMED.

Dated: April 3, 2006

         S/Joseph A. Greenaway, Jr.

         JOSEPH A. GREENAWAY, JR., U.S.D.J.